ORIGINAL

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ NOV 0 6 2009 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ELECTROGRAPH SYSTEMS, INC.;
ELECTROGRAPH TECHNOLOGIES, CORP.,

    Plaintiffs,

v.

EPSON IMAGING DEVICES CORPORATION;
EPSON ELECTRONICS AMERICA, INC.;
HITACHI, LTD.; HITACHI DISPLAYS, LTD.;
HITACHI ELECTRONIC DEVICES (USA), INC.;
SHARP CORPORATION; SHARP
ELECTRONICS CORPORATION; TOSHIBA
CORPORATION; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
TOSHIBA AMERICA INFORMATION
SYSTEMS, INC.; TOSHIBA MATSUSHITA
DISPLAY TECHNOLOGY, LTD.; SANYO
CONSUMER ELECTRONICS, LTD.; LG DISPLAY
CO., LTD.; LG DISPLAY AMERICA, INC.;
SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.; SAMSUNG
SEMICONDUCTOR, INC.; AU OPTRONICS
CORPORATION; AU OPTRONICS
CORPORATION AMERICA; CHI MEI
CORPORATION; CHI MEI
OPTOELECTRONICS CORPORATION; CMO
JAPAN CO., LTD.; CHI MEI
OPTOELECTRONICS USA, INC.; NEXGEN
MEDIATECH, INC.; NEXGEN MEDIATECH
USA, INC.; CHUNGHWA PICTURE
TUBES, LTD.; TATUNG COMPANY OF
AMERICA, INC.; HANNSTAR DISPLAY
CORPORATION; MITSUI & CO. (TAIWAN), LTD.

    Defendants.

CASE NO. _____

**09     4845**

**COMPLAINT**

HURLEY, J.

BOYLE. M.J.

Plaintiffs, Electrograph Systems, Inc. and Electrograph Technologies, Corp., for their Complaint against all defendants named herein, hereby allege as follows:

## I.   INTRODUCTION

1.     The defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least January 1, 1996 through at least December 11, 2006 (the "Relevant Period"). The purpose and effect of this conspiracy was to fix, raise, stabilize, and maintain prices for Thin Film Transistor-Liquid Crystal Display ("TFT-LCD") panels.

2.     TFT-LCD panels are used in a number of products, including, but not limited to, computer monitors, televisions and cellular telephones. As used herein, "TFT-LCD Products" refers to TFT-LCD panels, and products containing TFT-LCD panels, manufactured by any of the named defendants or their subsidiaries, affiliates, or co-conspirators.

3.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States. The conspiracy included communications and meetings in which defendants agreed to eliminate competition and fix the prices of TFT-LCD panels and TFT-LCD Products that they knew would be sold in the United States.

4.     Beginning in at least 1996, defendants met or talked to agree on TFT-LCD Product prices and the amount of TFT-LCD Products each would produce. As new producers entered the TFT-LCD Products market, the new producers also agreed to fix prices and to control supply. Defendants' conspiracy included agreements on the prices at which defendants would sell TFT-LCD Products to their own corporate subsidiaries and affiliates, as well as their co-conspirators, thereby ensuring TFT-LCD Product prices remained consistent among defendants and their customers, which was an attempt to prevent any price discrepancies to consumers.

5.     Throughout the Relevant Period, defendants' conspiracy was effective in moderating the normal downward pressures on prices for TFT-LCD Products caused by periods of oversupply and technological change. Defendants' conspiracy resulted in unusually long

2

periods of high prices and high profits. Although there were periods when prices for TFT-LCD Products temporarily declined as a result of new entrants being assimilated, or breakdowns in the effectiveness of the conspiracy, those price declines were from levels that had been set conspiratorially high, rather than from levels set by free and open competition. In addition, prices declined less than they would have in a competitive market. As a result of defendants' unlawful conduct, plaintiffs paid higher prices for TFT-LCD Products than they would have paid in a competitive market.

6.      Five of the defendants have already admitted to participating in this conspiracy: LG Display Co., Ltd. (together with its wholly-owned subsidiary, LG Display America, Inc.); Sharp Corporation; Chunghwa Picture Tubes, Ltd.; Hitachi Displays, Ltd.; and Epson Imaging Devices Corporation. On or about November 12, 2008, LG Display Co., Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix the price of LCD Panels. On or about May 15, 2009, Hitachi Displays, Ltd. agreed to plead guilty and pay a $31 million criminal fine for its role in the conspiracy to fix the price of TFT-LCD panels. On or about August 25, 2009, Epson Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to fix the price of LCD Panels.

7.      During the Relevant Period, Plaintiffs purchased TFT-LCD Products, both TFT-LCD panels and products containing TFT-LCD panels, in the United States and elsewhere directly and indirectly from the defendants, and/or the defendants' subsidiaries and affiliates and/or any agents the defendants or defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of defendants' conspiracy, and bring this action to recover the overcharges paid for the TFT-LCD Products they purchased during the Relevant Period.

## II.      JURISDICTION AND VENUE

8.      Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from

defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

9.    Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code, for injunctive relief and treble damages that Plaintiffs sustained due to defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the California Business and Professions Code (the "Cartwright Act"). Plaintiffs' claims are also brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from and an injunction against defendants due to their violations of Section 17200 *et seq.* of the California Business and Professions Code (the "California Unfair Competition Act").

10.    Plaintiffs also bring this action pursuant to Section 340 of the New York General Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General Business Law (the "Donnelly Act"). Plaintiffs' claims are also brought pursuant to Section 349 of the New York General Business Law, to obtain restitution from and an injunction against defendants due to their violations of Section 349 *et seq.* of the New York General Business Law (the "New York Unfair Competition Act")

11.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs claims under the Cartwright Act, the Donnelly Act and the state unfair competition laws set forth below under 28 U.S.C. § 1367. Plaintiffs' state law claims are related to their claims under Section 1 of the Sherman Act and they form part of the same case or controversy.

12.    The activities of defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiffs antitrust claims. During the Relevant Period, defendants' conspiracy affected the price of TFT-LCD Products purchased in

4

the United States.

13.     The activities of defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in California and New York. In particular defendants' and their co-conspirators' conspiracy directly and substantially affected the price of TFT-LCD Products purchased in these states. These effects also give rise to Plaintiffs' antitrust claims. Plaintiffs maintained operations in these states during the Relevant Period.

14.     This court has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22 and section 302 of the New York CPLR. Each defendant conducts substantial business in New York as well as California. In addition, defendants and their co-conspirators purposely availed themselves of the laws of the United States and the identified states insofar as they manufactured TFT-LCD panels for sale in the United States, including New York and California, or which were incorporated into TFT-LCD Products defendants and their co-conspirators knew would be sold to customers in the United States and New York and California. Defendants' and their co-conspirators' conspiracy affected this commerce in TFT-LCD Products in the United States and in New York and California.

15.     Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Defendants and their co-conspirators knew that price-fixed TFT-LCD Products containing price-fixed TFT-LCD panels would be sold and shipped into this District.

## III.   PARTIES

### A.   Plaintiffs

16.     Plaintiff Electrograph Systems, Inc. is a New York corporation with its principal place of business in New York. Electrograph Systems, Inc. was incorporated under the

name Electrograph Acquisitions, Inc. on April 10, 1997. The company's name was changed to Electrograph Systems, Inc. effective April 29, 1997. Through May 2009, Electrograph Systems, Inc. conducted business as a value-added wholesale distributor of display technology solutions, including plasma and LCD displays and components, rear screen projection TVs, projectors, and digital electronic products, primarily to resellers and system integrators. Electrograph Systems, Inc. specialized in display, audio, connectivity, and other complementary technologies for the commercial, consumer and government markets.

       17.    Plaintiff Electrograph Technologies, Corp. is a New York corporation, with its principal place of business in New York. Electrograph Technologies Corp. owns 100% of the outstanding capital stock of Electrograph Systems, Inc. In addition to its ownership of Electrograph Systems, Inc. and various other businesses, through May 2004, Electrograph Technologies Corp. conducted business as an information technology solutions provider that specialized in hardware and software procurement, display technology, custom networking, security, IP telephony, remote management, application development/e-commerce, storage, and enterprise and Internet solutions and offered its customers single-source solutions customized to their information systems needs by integrating its analysis, design and implementation services with hardware, software, networking products and peripherals from leading vendors.

       18.    During the Relevant Period, the Plaintiffs, and their predecessor entities described below, purchased TFT-LCD Products directly and indirectly from the defendants, and/or the defendants' subsidiaries and affiliates and/or any agents the defendants or defendants' subsidiaries and affiliates controlled. As such, the Plaintiffs suffered injury as a result of defendants' unlawful conduct. Throughout the Relevant Period, Plaintiffs, and their predecessor entities described below, conducted a substantial amount of business in New York.

    **B.**   **Plaintiffs' Corporate History**

       19.    Electrograph Technologies, Inc. was incorporated under the name Manchester Equipment Co., Inc. on August 21, 1973. The company's name was changed to

Manchester Technologies, Inc. on February 1, 2001, and then subsequently changed to
Electrograph Technologies Corp. on August 1, 2005. On August 1, 2005, upon consummation of
a merger by and among Electrograph Holdings, Inc., a Delaware Corporation, CICE Acquisition
Corp. ("merger sub"), a New York Corporation, and Manchester Technologies, Inc., the merger
sub was merged with and into Manchester Technologies, Inc., and Manchester Technologies, Inc.
became a wholly-owned subsidiary of Electrograph Holdings, Inc., and concurrently changed its
name to Electrograph Technologies Corp. During the Relevant Period, Electrograph
Technologies Corp., and its subsidiaries and affiliates, purchased TFT-LCD Products in the
United States and elsewhere directly and indirectly from the defendants, and/or the defendants'
subsidiaries and/or affiliates and/or any agents the defendants or defendants' subsidiaries and
affiliates controlled. As such, Electrograph Technologies Corp. suffered injury as a result of
defendants' unlawful conduct.

      20.    Prior to March 3, 2008, ActiveLight, Inc. was a Washington company with
its principal place of business in the State of Washington. ActiveLight, Inc. was a value-added
wholesale distributor of display technology solutions and projectors to the professional,
commercial and high-end consumer markets. During the Relevant Period, ActiveLight, Inc.
purchased TFT-LCD Products directly and indirectly from the defendants, and/or the defendants'
subsidiaries and/or affiliates and/or any agents the defendants or defendants' subsidiaries and
affiliates controlled. As such, ActiveLight, Inc. suffered injury as a result of defendants'
unlawful conduct. On February 21, 2006, Plaintiff, Electrograph Systems, Inc. acquired 100% of
the outstanding stock of ActiveLight, Inc. From the acquisition date through March 2, 2008,
ActiveLight, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc. On
March 3, 2008, ActiveLight, Inc. was merged into Electrograph Systems, Inc.

      21.    Prior to July 2006, CineLight Corporation was a Washington company
with its principal place of business in the State of Washington. CineLight Corporation was a
value-added wholesale distributor of advanced display technology products and accessories to
home theater designers and resellers. During the Relevant Period, CineLight Corporation

purchased TFT-LCD Products directly and indirectly from the defendants, and/or the defendants' subsidiaries and/or affiliates and/or any agents the defendants or defendants' subsidiaries and affiliates controlled. As such, CineLight Corporation suffered injury as a result of defendants' unlawful conduct.

22. On February 21, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of CineLight Corporation. From the date of the acquisition until July 2006, CineLight Corporation operated as a wholly-owned subsidiary of Electrograph Systems, Inc. In July 2006, CineLight Corporation was merged into ActiveLight, Inc.

23. Prior to March 3, 2008, International Computer Graphics, Inc. was a California company with its principal place of business in California. International Computer Graphics, Inc. conducted business as a specialty wholesale distributor of LCD, plasma and desktop displays, digital imaging peripherals and AV presentation products. During the Relevant Period, International Computer Graphics, Inc. purchased TFT-LCD Products directly and indirectly from the defendants, and/or the defendants' subsidiaries and/or affiliates and/or any agents the defendants or defendants' subsidiaries and affiliates controlled. As such, International Computer Graphics, Inc. suffered injury as a result of defendants' unlawful conduct.

24. On June 16, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of International Computer Graphics, Inc. From the date of the acquisition through March 2, 2008, International Computer Graphics, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc. On March 3, 2008, International Computer Graphics, Inc. was merged into Electrograph Systems, Inc.

25. Prior to September 2008, Champion Vision, Inc. was a New York company with its principal place of business in New York. During the Relevant Period, Champion Vision, Inc. purchased TFT-LCD Products directly and indirectly from the defendants, and/or the defendants' subsidiaries and/or affiliates and/or any agents the defendants or defendants' subsidiaries and affiliates controlled. As such, Champion Vision, Inc. suffered injury as a result of defendants' unlawful conduct.

26.     In September 2008, Champion Vision, Inc. was merged into Electrograph Systems, Inc.

27.     Prior to its corporate dissolution, Coastal Office Products, Inc., a Maryland company, was a wholly-owned subsidiary of Electrograph Technologies Corp., with its principal place of business in Maryland. Coastal Office Products, Inc. was a reseller and provider of microcomputer services and peripherals to companies in the greater Baltimore, Maryland area. During the Relevant Period, Coastal Office Products, Inc. purchased TFT-LCD Products directly and indirectly from the defendants, and/or the defendants' subsidiaries and/or affiliates and/or any agents the defendants or defendants' subsidiaries and affiliates controlled. As such, Coastal Office Products, Inc. suffered injury as a result of defendants' unlawful conduct. In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

28.     During the Relevant Period, Electrograph Systems, Inc. acquired all of the outstanding stock of ActiveLight, Inc., CineLight Corporation and International Computer Graphics, Inc. and formed Champion Vision, Inc. as a wholly-owned subsidiary. In addition, during the Relevant Period, Electrograph Technologies Corp. acquired all of the outstanding stock of Coastal Office Products, Inc. As such, the entities known as ActiveLight, Inc., CineLight Corporation, International Computer Graphics, Inc., Champion Vision, Inc. and Coastal Office Products, Inc. are herein referred to collectively as the "predecessor entities." By acquiring the stock of companies that purchased TFT-LCD Products, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities. Some of the predecessor entities were also merged into Electrograph Systems, Inc. and thus, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities. As stated above, during the Relevant Period, these predecessor companies purchased TFT-LCD Products manufactured and sold by defendants, their co-conspirators, and others. As a result of defendants' conspiracy, these predecessor entities were injured in their business and property because the prices they paid for TFT-LCD Products were artificially inflated by defendants'

conspiracy. As used herein, any reference to either Electrograph Systems, Inc. or Electrograph Technologies Corp. includes any of the predecessor entities whose stock was acquired or obtained by either Electrograph Systems, Inc. or Electrograph Technologies Corp.

**C.     Japanese Defendants**

**1.     Epson**

29.     Defendant Epson Imaging Devices Corporation ("Epson Japan") is a Japanese company with its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6104 Japan. Up until December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation. The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation. During the Relevant Period, Epson Japan manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

30.     Defendant Epson Electronics America, Inc. ("Epson America") is a California corporation with its principal place of business at 2580 Orchard Parkway, San Jose, California. Epson America is a wholly-owned and controlled subsidiary of Seiko Epson Corporation, which is also the ultimate parent company of defendant Epson Imaging Devices Corporation. During the Relevant Period, Epson America sold and distributed TFT-LCD Products manufactured by Epson Imaging Devices Corporation to customers throughout the United States and elsewhere.

31.     Defendants Epson Japan and Epson America are referred to collectively herein as "Epson." They participated in the conspiracy through the actions of their respective officers, employees and representatives acting with actual or apparent authority. Alternatively, defendant Epson America was a member of the conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of Epson Japan. Epson Japan dominated or controlled Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for TFT-LCD panels.

10

## 2. **Hitachi**

32.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. The company was one of the original producers of TFT-LCDs. In 2002, it spun off its TFT-LCD manufacturing assets to Hitachi Displays, Ltd., a wholly-owned subsidiary. During the Relevant Period, Hitachi, Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

33.     Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays, Ltd. was formed in 2002 and acquired defendant Hitachi, Ltd.'s TFT-LCD manufacturing business. Hitachi Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd. During the Relevant Period, Hitachi Displays, Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States and elsewhere. Hitachi Displays, Ltd. is a member of the joint venture IPS Alpha Technology, Ltd.

34.     Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 575 Mauldin Road, Greenville, South Carolina. Its ultimate parent company is Hitachi, Ltd. During the Relevant Period, Hitachi Electronic Devices (USA), Inc. sold and distributed TFT-LCD Products manufactured by Hitachi, Ltd. and Hitachi Displays, Ltd. to customers throughout the United States and elsewhere.

35.     Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. are sometimes referred to collectively herein as "Hitachi." Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority. Alternatively, defendants Hitachi Displays, Ltd. and Hitachi Electronic Devices (USA), Inc. were members of the conspiracy by virtue of their status during the Relevant Period as the alter egos or agents of Hitachi Ltd. Hitachi Ltd. dominated or controlled Hitachi Displays, Ltd. and Hitachi Electronic

11

Devices (USA), Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for TFT-LCD panels.

### 3.   Sharp

36.     Defendant Sharp Corporation is a Japanese company with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan. The company was one of the earliest producers of TFT-LCDs. During the Relevant Period, Sharp Corporation manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

37.     Defendant Sharp Electronics Corporation is a New York corporation with its principal place of business at Sharp Plaza, Mahwah, New Jersey. Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of defendant Sharp Corporation. During the Relevant Period, Sharp Electronics Corporation sold and distributed TFT-LCD Products manufactured by defendant Sharp Corporation to customers throughout the United States and elsewhere.

38.     Defendants Sharp Corporation and Sharp Electronics Corporation are sometimes referred to collectively herein as "Sharp." Defendants Sharp Corporation and Sharp Electronics Corporation were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority. Alternatively, defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of Sharp Corporation. Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for TFT-LCD panels.

### 4.   Toshiba

39.     Defendant Toshiba Corporation is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. Toshiba Corporation participates in two joint ventures that manufacture, sell, and distribute TFT-LCD

Products – Toshiba Matsushita Display Technology Co., Ltd. and IPS Alpha Technology, Ltd.
During the Relevant Period, Toshiba Corporation manufactured, sold, and distributed TFT-LCD
Products to customers throughout the United States and elsewhere.

        40.     Defendant Toshiba America Electronic Components, Inc. is a California
corporation with its principal place of business at 19900 MacArthur Boulevard, Suite 400, Irvine,
California. Toshiba America Electronic Components, Inc. is a wholly-owned and controlled
subsidiary of Toshiba America, Inc., a holding company for defendant Toshiba Corporation.
Toshiba America Electronic Components, Inc. is the United States sales and marketing
representative for defendants Toshiba Corporation and Toshiba Matsushita Display Technology
Co., Ltd. During the Relevant Period, Toshiba America Electronic Components, Inc. sold and
distributed TFT-LCD Products manufactured by Toshiba Corporation to customers throughout
the United States and elsewhere.

        41.     Defendant Toshiba America Information Systems, Inc. is a California
corporation with its principal place of business at 9470 Irvine Boulevard, Irvine, California. Toshiba
America Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America,
Inc. During the Relevant Period, Toshiba America Information Systems, Inc. sold and distributed
TFT-LCD Products manufactured by Toshiba Corporation to customers throughout the United States
and elsewhere.

        42.     Defendants Toshiba Corporation, Toshiba America Electronics Components,
Inc., and Toshiba America Information Systems, Inc. are sometimes referred to collectively herein as
"Toshiba." Defendants Toshiba Corporation, Toshiba America Electronics Components, Inc., and
Toshiba America Information Systems, Inc. were members of the conspiracy that is the subject of
this Complaint by virtue of the actions of their respective officers, employees and representatives
acting with actual or apparent authority. Alternatively, defendants Toshiba America Electronics
Components, Inc., and Toshiba America Information Systems, Inc. were members of the conspiracy
by virtue of their status during the Relevant Period as the alter egos or agents of Toshiba
Corporation. Toshiba Corporation dominated or controlled Toshiba America Electronics

Components, Inc., and Toshiba America Information Systems, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for TFT-LCD panels.

### 5. **Toshiba Matsushita**

43.     Defendant Toshiba Matsushita Display Technology Co., Ltd. ("Toshiba Matsushita") is a Japanese company with its principal place of business at Rivage Shinagawa, 18, Konan c4-chome, Minato-ku, Tokyo 108-0075, Japan. Toshiba Matsushita is a joint venture between Toshiba Corporation and Panasonic Corporation (formerly known as Matsushita Electric Industrial Co., Ltd.). Toshiba Matsushita was created for the purpose of manufacturing TFT-LCD Products. During the Relevant Period, Toshiba Matsushita manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

### 6. **Sanyo**

44.     Defendant Sanyo Consumer Electronics, Ltd. ("Sanyo Consumer") is a Japanese company with it principal place of business at 7-101, Tachikawa-cho, Tottori 680-0061, Japan. Sanyo Consumer was formerly known as Tottori Sanyo Electric Co. Prior to October 2004, Tottori Sanyo Electric Co. operated as a subsidiary of Sanyo Electric Co., Ltd. During the Relevant Period, Sanyo Consumer, then known as Tottori Sanyo Electric Co., manufactured, sold and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

### D. **Korean Defendants**

### 1. **LG Display**

45.     Defendant LG Display Co., Ltd., formerly known as LG.Philips LCD Co., Ltd., is a Korean entity with its principal place of business at 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, Korea 150-721. LG Display Co., Ltd. was created in July 1999 as a joint venture between co-conspirators LG Electronics, Inc. and Royal Philips Electronics, N.V. In July 2004, LG Display Co., Ltd. became a public company, with LG Electronics, Inc. and Royal Philips Electronics N.V. as the controlling shareholders. LG Display Co., Ltd. describes itself as "the global leader in the development and manufacturer of TFT-LCD panels for televisions, computer monitors, notebooks

14

and emerging mobile applications." During the Relevant Period, LG Display Co., Ltd. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

46.     Defendant LG Display America, Inc., formerly known as LG.Philips LCD America, Inc., is a California corporation with its principal place of business at 150 East Brokaw Road, San Jose, California. LG Display America, Inc. is a wholly-owned and controlled subsidiary of LG Display Co., Ltd. During the Relevant Period, LG Display America, Inc. sold and distributed TFT-LCD Products manufactured by LG Display Co., Ltd. to customers throughout the United States and elsewhere.

47.     Defendants LG Display Co., Ltd. and LG Display America, Inc. are sometimes referred to collectively herein as "LG Display." Defendants LG Display Co., Ltd. and LG Display America, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority. Alternatively, defendant LG Display America, Inc. was a member of the conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of LG Display Co., Ltd. LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for TFT-LCD panels.

        **2.     Samsung**

48.     Defendant Samsung Electronics Co., Ltd. is a Korean company with its principal place of business at Samsung Electronics Building, 1320-10, Seocho 2-dong, Seocho-gu, Seoul, Korea. It is the world's largest producer of TFT-LCD Products. During the Relevant Period, it manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

49.     Defendant Samsung Electronics America, Inc. ("Samsung America") is a New York corporation with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey. Samsung America is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd. During the Relevant Period, Samsung America sold and distributed TFT-

LCD Products manufactured by Samsung Electronics Company, Ltd. to customers throughout the United States and elsewhere.

50. Samsung Semiconductor, Inc. is a California corporation with its principal place of business at 3655 North First Street, San Jose, California. Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of defendant Samsung Electronics Company, Ltd. During the Relevant Period, Samsung Semiconductor, Inc. sold and distributed TFT-LCD Products manufactured by Samsung Electronics Company, Ltd. throughout the United States and elsewhere.

51. Defendants Samsung Electronics Company, Ltd., Samsung America, and Samsung Semiconductor, Inc. are sometimes referred to collectively herein as "Samsung." Defendants Samsung Electronics Company, Ltd., Samsung America, and Samsung Semiconductor, Inc. were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority. Alternatively, defendants Samsung America, and Samsung Semiconductor, Inc. were members of the conspiracy by virtue of their status during the Relevant Period as the alter egos or agents of Samsung Electronics Company, Ltd. Samsung Electronics Company, Ltd. dominated or controlled Samsung America, and Samsung Semiconductor, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for TFT-LCD panels.

    **E.**    **Taiwanese Defendants**

    **1.**    **AU Optronics**

52. Defendant AU Optronics Corporation is a Taiwanese company with its principal place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. AU Optronics Corporation was created in 2001 by the merger of Acer Display Technology, Inc. and Unipac Electronics, both of which were involved in the manufacture of TFT-LCD Products. During the Relevant Period, AU Optronics Corporation manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

53. Defendant AU Optronics Corporation America ("AU America") is a California corporation with its principal place of business at 9720 Cypresswood Drive, Suite 241,

Houston, Texas. AU America was formerly known as Acer Display Technology America, Inc. AU America is a wholly-owned and controlled subsidiary of defendant AU Optronics Corporation. In 2006, Hsuan Bin Chen, the president and Chief Operating Officer of AU Optronics Corporation, was simultaneously the Chairman of AU America. During the Relevant Period, AU America sold and distributed TFT-LCD Products manufactured by AU Optronics to customers throughout the United States and elsewhere.

54.     Defendants AU Optronics Corporation and AU America are sometimes collectively referred to herein as "AU Optronics." Defendants AU Optronics Corporation and AU America were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective officers, employees and representatives acting with actual or apparent authority. Alternatively, defendant AU America was a member of the conspiracy by virtue of its status during the Relevant Period as the alter ego or agent of AU Optronics Corporation. AU Optronics Corporation dominated or controlled AU America regarding conspiracy activities and used that domination or control to charge artificially high prices for TFT-LCD panels.

### 2.     Chi Mei

55.     Defendant Chi Mei Corporation ("CMC") is a Taiwanese company with its principal place of business located at No. 11-2, Jen Te 4th St., Jen Te Village, Jen Te, Tainan 717, Taiwan. CMC is the parent company for all of the Chi Mei entities herein. During the Relevant Period, CMC manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

56.     Defendant Chi Mei Optoelectronics Corporation ("CMO") is a Taiwanese company with its principal place of business at No. 3, Sec. 1, Huanshi Road, Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan. It is a subsidiary of CMC. CMO was formed in 1998, and has since become a major manufacturer of TFT-LCD Products. During the Relevant Period, CMO manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

57.     Defendant CMO Japan Co., Ltd. ("CMO Japan") is a Japanese company

17

headquartered at Nansei-Yaesu Bldg. 4-F, 2-2-10 Yaesu, Chuo-ku, Tokyo 104-0028, Japan. Up until 2006, CMO Japan was known as International Display Technology, Ltd. CMO Japan is a wholly-owned and controlled subsidiary of defendant CMO. CMO Japan has been in the TFT-LCD business since 2001. During the Relevant Period, CMO Japan manufactured, sold, and distributed TFT-LCD Products throughout the United States and elsewhere.

58.     Defendant Chi Mei Optoelectronics USA, Inc. ("CMO USA") is a Delaware corporation with its principal place of business at 101 Metro Drive, Suite 510, San Jose, California. Up until 2006, CMO USA was known as International Display Technology U.S.A., Inc. CMO USA is a wholly-owned and controlled subsidiary of defendant CMO Japan. The Chairman of CMO USA in 2006, Chen-Lung Kuo, was previously the Chairman of CMO Japan's predecessor, and in or about 2007 became Vice President in charge of sales and marketing for CMO. Similarly, the President of CMO USA in 2006, Junichi Ishii, was previously the President of CMO Japan's predecessor. During the Relevant Period, CMO USA sold and distributed TFT-LCD Products manufactured by CMO Japan to customers throughout the United States and elsewhere.

59.     Defendant Nexgen Mediatech, Inc. ("Nexgen") is a Taiwanese company with its principal place of business at No. 11-2, Jen Te 4th St., en Te Village Jen Te, Tainan 717 Taiwan. Nexgen is a wholly-owned and controlled subsidiary of CMC. During the Relevant Period, Nexgen sold and distributed TFT-LCD Products manufactured by CMO to customers throughout the United States and elsewhere.

60.     Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a California corporation with its principal place of business at 16712 East Johnson Drive, City of Industry, California. Nexgen USA is a wholly-owned and controlled subsidiary of CMC. During the Relevant Period, Nexgen USA sold and distributed TFT-LCD Products manufactured by CMO to customers throughout the United States and elsewhere.

61.     Defendants CMC, CMO, CMO Japan, CMO USA, Nexgen, and Nexgen USA are sometimes referred to collectively herein as "Chi Mei." The Chi Mei companies were members of the conspiracy that is the subject of this Complaint by virtue of the actions of their respective

18

officers, employees and representatives acting with actual or apparent authority. Alternatively, defendant CMO, CMO Japan, CMO USA, Nexgen, and Nexgen USA were members of the conspiracy by virtue of their status during the Relevant Period as the alter egos or agents of CMC. CMC dominated or controlled CMO, CMO Japan, CMO USA, Nexgen, and Nexgen USA regarding conspiracy activities and used that domination or control to charge artificially high prices for TFT-LCD panels.

### 3. **Chunghwa**

62. Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company with its principal place of business at 1127 Heping Road, Bade City, Taoyuan, Taiwan. It is a subsidiary of Tatung Company, a consolidated consumer electronics and information technology company based in Taiwan. Chunghwa Picture Tubes, Ltd.'s Board of Directors includes representatives from Tatung Company. The Chairman of Chunghwa Picture Tubes, Ltd., Weishan Lin, is also the Chairman and General Manager of Tatung Company. During the Relevant Period, Chunghwa Picture Tubes, Ltd. manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

63. Tatung Company of America, Inc. ("Tatung America") is a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California. Tatung America is a subsidiary of Tatung Company. Currently, Tatung Company owns approximately half of Tatung America. The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin. During the Relevant Period, Tatung America sold and distributed TFT-LCD Products manufactured by Chunghwa Picture Tubes, Ltd. to customers throughout the United States and elsewhere.

64. Defendants Chunghwa Picture Tubes, Ltd. and Tatung America are sometimes referred to collectively herein as "Chunghwa." During the Relevant Period, Chunghwa and Tatung were closely affiliated, commonly owned, controlled and dominated by Tatung Corporation, and functioned as a single enterprise and/or alter egos.

### 4. **HannStar**

19

65. Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan. HannStar has been in the business of manufacturing and selling TFT-LCD Products since 1998. During the Relevant Period, HannStar manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

### 5. Mitsui Taiwan

66. Defendant Mitsui & Co. (Taiwan), Ltd. ("Taiwan Mitsui") is a Taiwanese company with its principal place of business at Tunnan Tower 21F; No. 97 Tunhua South Rd. Section 2 Taipei City, 106 Taiwan. Taiwan Mitsui is a wholly-owned subsidiary of co-conspirator Mitsui & Co., Ltd. During the Relevant Period, Taiwan Mitsui manufactured, sold and distributed TFT-LCD Products to customers throughout the United States and elsewhere.

## IV.   AGENTS AND CO-CONSPIRATORS

67. The acts alleged against the defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendants' businesses or affairs.

68. Each defendant acted as the principal, agent, or joint venturer of, or for, other defendants with respect to the acts, violations, and common course of conduct alleged by plaintiffs. Each defendant that is a subsidiary of a foreign parent acts as the United States agent for TFT-LCD panels and/or TFT-LCD Products made by its parent company.

69. Various persons and/or firms not named as defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. These co-conspirators include, but are not limited to, LG Electronics, Inc., LG Electronics USA, Inc., Hydis Technologies Co., LTD., NEC LCD Technologies, Ltd., Royal Philips Electronics N.V., Philips Electronics North America Corp., Ltd., IPS Alpha Technology, Ltd., Mitsui & Co., Ltd., Mitsubishi Electric Corporation, Panasonic Corporation, Panasonic Corporation of North America, Sanyo Electric Company, Ltd., Sanyo North America Corporation, and Seiko Epson Corporation.

70.     The acts charged in this Complaint have been done by defendants and their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees or representatives while actively engaged in the management of each defendant's or co-conspirator's business or affairs.

## V.        TRADE AND COMMERCE

71.     During the Relevant Period, each defendant, or one or more of its subsidiaries, sold TFT-LCD Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

72.     During the Relevant Period, defendants collectively controlled a vast majority of the market for TFT-LCD Products, both globally and in the United States.

73.     The business activities of the defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. The business activities of the defendants also substantially affected trade and commerce in California and New York and caused antitrust injuries in California and New York.

74.     For example, Defendants LG Display Co., Ltd., LG Display America, Inc., Sharp Corporation and Chunghwa Picture Tubes, Ltd. all admitted during their plea hearings that acts in furtherance of the conspiracy were carried out within California. Each agreed that "Acts in furtherance of this conspiracy were carried out within the Northern District of California. TFT-LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this District." Case 3:08-cr-00803, Document 10-1 at 4; Case 3:08-cr-00802, Document 9-1 at 5; Case 3:08-cr-00804, Document 10-1 at 4. Moreover, defendants and their co-conspirators and/or their agents delivered a substantial amount of TFT-LCD Products to New York consumers, including Plaintiffs.

## VII.     FACTUAL ALLEGATIONS

### A.       TFT-LCD Technology

75.     The technology behind TFT-LCDs is not new. In the 1950s and 1960s, RCA Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-

power display technology. In the 1970s, after RCA Corp. discontinued its efforts, Japanese companies took the lead in commercializing liquid crystal technology. These efforts resulted in monochrome calculators and watches. By at least the early 1990s, liquid crystal technology was introduced in notebook computers and small, low-resolution televisions. In the mid-1990s, the technology advanced further with the development of TFT-LCDs.

76.     As noted above, the basic structure of a TFT-LCD panel is two glass substrates sandwiching a layer of liquid crystal compound. Liquid crystals change orientation under an applied electric field and can thereby block or pass light. One glass substrate has thin chemical films that act as transistors, and the other glass substrate is coated with liquid pigments that act as color filters. When voltage is applied to the transistors, the liquid crystal bends, causing light to pass through the filters to create red, green, or blue pixels. Pixels are the smallest unit in a picture image, and the density of pixels in a display determines the resolution.

77.     The term "active matrix" describes the ability to switch each pixel in a display individually. Unlike older TFT-LCDs that have one transistor for each row and column of pixels, TFT-LCDs have a transistor for each pixel. Thus, the term "active matrix TFT-LCD" is sometimes used interchangeably with TFT-LCD. Active matrix displays are brighter and sharper than passive matrix displays of the same size.

78.     The glass substrates used for TFT-LCD panels begin with a "motherglass," a sheet of glass that is cut to make multiple panels. TFT-LCDs are manufactured in fabs that are equipped to handle a particular size motherglass. Technological innovations over time have allowed manufacturers to begin the manufacturing process with larger and larger size motherglass sheets. This, in turn, has resulted in the ability to fabricate larger and/or more TFT-LCD panels. Each increase in motherglass size is described as a generation. Third generation fabs in the 1998 to 1999 period typically utilized 550 millimeter ("mm") by 650 mm motherglass, while some current (eighth generation) fabs utilize 2160 mm by 2460 mm motherglass. The use of larger motherglass provides substantial cost savings to manufacturers.

79.     TFT-LCDs are capable of producing the same image as cathode ray tubes

22

("CRTs"), but in a much smaller package. TFT-LCDs also have lower energy requirements, are generally easier to read, and do not flicker like CRTs. TFT-LCD panels of approximately 10 inches or less in diagonal are considered "small" or "medium" displays. They are also referred to as "mobile displays." These displays are commonly used in cell phones, personal digital assistants, and cameras.

80.     TFT-LCDs of 10 inches in diagonal and larger are considered "large-area displays." Large-area displays are most commonly used for desktop computer monitors, notebook computers, and televisions. The core products during most of the Relevant Period were displays for notebook computers and computer monitors. During much of the Relevant Period, 14-inch and 15-inch notebook computers and 15-inch to 17-inch computer monitors were the most popular TFT-LCD Products, representing as much as 80 percent of all TFT-LCDs produced for notebook computers or computer monitors.

81.     TFT-LCD panels have no independent utility, and have value only as components of other products, such as TVs, computer monitors, and laptops. The demand for TFT-LCD panels thus directly derives from the demand for such products.

82.     The market for TFT-LCD panels and the market for the products into which they are placed are inextricably linked and intertwined because the TFT-LCD panel market exists to serve the TFT-LCD Products markets. The markets for TFT-LCD panels and TFT-LCD Products are, for all intents and purposes, inseparable in that one would not exist without the other.

83.     Plaintiffs have participated in the market for TFT-LCD panels through their direct purchases from defendants of TFT-LCD panels and TFT-LCD Products and their purchases of TFT-LCD Products indirectly from non-defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought TFT-LCD panels and TFT-LCD Products, and plaintiffs have been injured thereby and paid supra-competitive prices for TFT-LCD panels and TFT-LCD Products.

84.     Plaintiffs have participated in the market for products containing TFT-

LCD panels. To the extent plaintiffs indirectly purchased TFT-LCD panels as part of a TFT-LCD product, defendants' and their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold TFT-LCD panels in these products. Plaintiffs were not able to pass the inflated prices on to its customers.

85.     Consumers, including Plaintiff, are injured by paying supra-competitive prices for TFT-LCD panels and TFT-LCD Products.

**B.     Structure of the TFT-LCD Industry**

86.     The TFT-LCD industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1.     Market Concentration**

87.     The TFT-LCD industry is highly concentrated, a factor that is conducive to the type of collusive activity alleged by plaintiffs. In 2005, the top five suppliers – Samsung, LG Display, Sharp, AU Optronics, and Chi Mei – collectively shipped 90 percent of all TFT-LCD panels for television use. According to estimates in late 2006 from industry analyst iSuppli Corporation ("iSuppli"), LG Display had the greatest share of TFT-LCD television shipments in the first quarter of 2006 (22.3%), followed by Samsung (20%), Chi Mei (18.7%), AU Optronics (16.8%), and Sharp (13.9%). These companies were the five largest producers as measured by market share during much of the Relevant Period.

**2.     Information Sharing**

88.     Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their

24

pricing for TFT-LCD Products as alleged below.

89.     Additionally, the TFT-LCD industry is analyzed by several market research firms. Each of these firms offers, for a fee, monthly market data on pricing, supply, utilization of fabs, and other key indicators of market activity. The capacity and pricing data reported by these firms comes directly from manufacturers. Manufacturers typically report historical, current, and perhaps most importantly, prospective information. Thus, defendants had access to each other's future plans for bringing capacity on line, capacity utilization, market share, pricing, and the advent of new technology. Because there were very few companies that needed to be analyzed in order to obtain this data, all competitors in the TFT-LCD market had ready and timely access to reliable information about their competition's pricing as well as future supply and capacity decisions. By meeting together as herein below alleged as well as monitoring and analyzing this information over time, participants in the conspiracy were able to signal their respective intent, verify that the conspiracy was working, and identify any parties who might be deviating from the conspiracy.

### 3.     **Consolidation**

90.     The TFT-LCD industry experienced significant consolidation during the Relevant Period, including: (a) the creation of AU Optronics in 2001 through the merger of Acer Display and Unipac Electronics; (b) the creation of Toshiba Matsushita in 2002; (c) Fujitsu, Ltd.'s transfer of its TFT-LCD business to Sharp in 2005; (d) the formation of IPS Alpha in 2005 by Hitachi, Panasonic, and Toshiba; and (e) AU Optronics' acquisition in 2006 of Quanta Display, which resulted in AU Optronics becoming the third-largest manufacturer of TFT-LCD Products.

### 4.     **Multiple Interrelated Business Relationships**

91.     The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion. AU Optronics, for example, entered into licensing arrangements with Sharp in 2005 and Samsung in 2006. Chunghwa did likewise with Sharp in December of 2006. Chi Mei has licensing arrangements

with Sharp, AU Optronics, Chunghwa, HannStar and Hitachi.

92.     The industry has a close-knit nature whereby multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude. These business relationships also created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.

### 5.     **High Costs of Entry Into the Industry**

93.     There are significant manufacturing and technological barriers to entry into the TFT-LCD industry. Efficient fabs are large and costly. TFT-LCD Products are also subject to technological advances, so that firms within the industry must spend significant capital on research and development. DisplaySearch, a research firm in Austin, Texas that covers the TFT-LCD industry, reported in September 2005 that the top TFT-LCD manufacturers collectively spend $30 million a day on property, plant, and equipment. A January 2006 DisplaySearch report noted that a typical seventh generation fab can cost more than $3 billion.

94.     During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a substantial rate. Later in the conspiracy, approximately 70 percent of the cost of TFT-LCD panel production was attributable to the cost of raw materials. The combination of price discussions and manipulation of the output of TFT-LCD Products allowed defendants to keep prices above where they would have been but for the conspiracy.

### 6.     **The "Crystal Cycle"**

95.     Like all markets, the TFT-LCD industry is subject to business cycles of supply and demand. In the TFT-LCD industry, this cycle is known as the "crystal cycle." This cycle has been described as "boom and bust" periods caused by alternating periods of oversupply and shortages, which create downward and upward pressures on prices for TFT-LCD Products. One fact that can affect such oversupply is the perceived demand for such products and whether manufacturers have adequately predicted such demand in determining how much capacity to

build and how many TFT-LCD Products to produce.

96.    Another factor is the entry of new competitors. Typically, when a new competitor enters a market, it brings incremental production online thereby adding supply, and prices drop until an equilibrium is reached. In the TFT-LCD industry, however, defendants conspired to rein in and discipline these new entrants until the new entrants were assimilated into the conspiracy. This had the effect of tempering price drops and preventing them from reaching a competitive equilibrium.

97.    The conspiracy did not completely eliminate the effects of the crystal cycle in the TFT-LCD industry. There were periods when defendants' collusive practices drove prices for TFT-LCD Products so high that demand began to fall to the point that defendants lowered prices for short periods of time. However, defendants' efforts to stabilize prices were successful in moderating the effects of the crystal cycle, including the impact on prices paid by direct purchasers. To the extent that prices for TFT-LCD Products fell, they fell from levels that had been set conspiratorially, rather than from levels set by free and open competition. Additionally, prices did not fall as low as they would have absent the conspiratorial conduct.

### 7.    **Dominant Products**

98.    Notwithstanding that there may be different applications for TFT-LCDs, there is a consistent and homogeneous way for defendants to monitor, analyze, discipline, and enforce their conspiracy. This can be done by looking at the predominant, or most popular, size panels and the applications for those panels that represent the highest percentage of sales. This can also be accomplished by looking at standardized statistics used in the industry, such as the amount of glass produced and revenues per metric ton of glass. By using these, and other industry analytics, defendants could monitor, analyze, discipline, and enforce their conspiracy.

### C.    **Pre-Conspiracy Market**

99.    Until the mid-1990s, Japanese companies like Hitachi, Toshiba, and Sharp were essentially the exclusive suppliers of TFT-LCD panels.

100.    In early 1995, the industry faced declining TFT-LCD panel prices, which

industry analysts attributed to advances in technology and improving efficiencies. One analyst in this period noted that the "flat panel display industry is following the classic cyclical business pattern of the semiconductor industry." The Japanese manufacturers realized that the capacity growth from investing in new plants was weakening the price of TFT-LCDs, and they slowed the rate of their investments. This, however, provided an opening to Korean manufacturers.

101.     In 1995, three Korean companies – Samsung, LG Electronics, Inc. and, to a lesser extent, Hyundai – entered the market. These Korean firms offered comparable products at reduced prices in an effort to quickly gain market share. This resulted in increased competition in 1995, which contributed to the significant price declines seen during that timeframe.

102.     Increases in manufacturing capacity and decreases in manufacturing costs seemed to assure continuing price declines. By mid-1995, the Japanese companies and the new Korean competitors had a total capacity to supply 14 million TFT-LCD panels, while demand for them was only about three million. In addition to the surges in capacity during 1995, "[costs] were also dropping as production volume increases and manufacturing methods improved."

103.     By late 1995, the effect of the entry by Korean suppliers had pushed down the price of some TFT-LCD panels by 50 percent from the previous year. The origin of the TFT-LCD conspiracy may be traceable to this trough in prices.

**D.     Defendants' and Co-Conspirators' Illegal Agreements**

104.     The TFT-LCD conspiracy was effectuated through a combination of group and bilateral discussions. In the formative years, when the Japanese defendants first entered into the conspiracy, bilateral discussions were the primary method of communication. During this period of the conspiracy, Hitachi, Sharp, and Toshiba met, or talked to, at least one other defendant about the prices for TFT-LCD Products, and thereby created a model for how the conspiracy would be carried out after the Korean, and later the Taiwanese defendants joined. These meetings among Hitachi, Sharp, and Toshiba included the discussion of price as well as capacity utilization. As more manufacturers entered the conspiracy, however, group meetings

became more prevalent, until by 2001 a formal system of multilateral and bilateral meetings was in place.

### 1.   "Crystal Meetings"

105.   The group meetings among the participants in the TFT-LCD price-fixing conspiracy were referred to as "crystal meetings." Crystal meetings were attended by employees at three general levels of the defendants' corporations. The first level of these meetings were attended by the Chief Executive Officers or Presidents, and were known as "CEO" or "top" meetings. The second level were management-level meetings, referred to as "commercial" or "operation" meetings. The third level were meetings attended by lower-level sales and marketing personnel.

106.   In a typical crystal meeting, the participants established a meeting agenda that included a discussion of the past month's producer shipments, customer demand, capacity utilization, and prices. Meeting participants shared information relating to all of these topics so that defendants could agree on what price each would charge for TFT-LCD panels to be sold in the following month. Meeting participants discussed and agreed upon target prices, floor prices, and price ranges for TFT-LCD panels. They also discussed prices of TFT-LCD panels that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.

107.   The purpose of the CEO or top meetings was to stabilize or raise prices. At the CEO meetings, the participants discussed prices and the supply and demand situation. The participants also discussed monthly and quarterly TFT-LCD fab output and supply figures, as well as the number of production days the fabs would operate for the next month, and agreed on output restrictions. Each meeting had an individual designated as the "chairman" who would use a projector or a whiteboard to put up figures on supply and demand and price for the group to review. The attendees would take turns making comments and adjusting the numbers. At some point during the meeting, the participants would reach an agreement on price.

108.   The commercial or operation meetings were attended by the defendants'

respective Vice Presidents of sales and marketing and other senior sales employees. The
structure and content of the commercial meetings was largely the same as the CEO meetings.
The participants discussed price, output, capacity, and the general market situation. These
meetings occurred approximately monthly and sometimes quarterly.

109.    Each of the participants in these meetings knew, and in fact discussed, the
significant impact that the price of TFT-LCD panels has on the cost of the finished products into
which they are placed. Defendants knew that the conspiratorially high prices of TFT-LCD panels
would be reflected in the prices for finished TFT-LCD Products, and thus, there was no need to
specifically discuss the prices of finished TFT-LCD Products.

110.    The agreements reached at these meetings included: (1) establishing target
prices, floor prices, and price ranges; (2) placing agreed-upon values on various attributes of
panels, such as quality or certain technical specifications; (3) what to tell customers as the reason
for price increases; (4) coordinating uniform public statements regarding anticipated supply and
demand; (5) exchanging information about fabrication plant utilization and production capacity;
and (6) reaching out to other competitors to encourage them to abide by the agreed-upon pricing.
The meeting participants also agreed to maintain or lower production capacity.

111.    Compared to the CEO and commercial meetings, the lower level meetings
were less formal, and typically occurred at restaurants over lunch. The purpose of the lower
level meetings was to exchange market information that would facilitate implementation of the
conspiracy and carry out the agreements made at the CEO and commercial meetings.
Participants in the lower level meetings exchanged information relating to past and future prices
of TFT-LCD Products and shipment quantities.

112.    In the summer of 2006, defendants discontinued the lower level meetings
in favor of coordinated one-on-one meetings. The meetings were coordinated so that on the
same date, two sets of competitors met one-on-one. After that meeting, each of them met one-
on-one with another competitor. This continued until all competitors met with each other. These
coordinated meetings took place until about November or December 2006. It was defendants'

specific intent to conceal their meetings and for these coordinated one-on-one meetings to accomplish the same purposes as the group meetings.

### 2.    Bilateral Discussions

113.    The crystal meetings were supplemented by bilateral discussions between various defendants. The purpose of the bilateral discussions was to exchange information about past and future pricing, as well as information about shipments.

114.    Defendants had bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone calls, e-mails, and instant messages. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

115.    Bilateral discussions were also used to synchronize prices with manufacturers that did not ordinarily attend the group meetings. For example, HannStar was responsible for notifying Hitachi of the pricing agreements reached at the crystal meetings. Hitachi implemented the agreed-upon pricing as conveyed by HannStar. In this way, Hitachi participated in the conspiracy to fix the prices of TFT-LCD Products.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

116.    Defendant AU Optronics participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Additionally, Quanta Display Inc. and Unipac Electronics, which merged with AU Optronics, participated in lower level meetings. Through these discussions, AU Optronics agreed on prices and supply levels for TFT-LCD Products.

117.    Defendant Chi Mei participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Chi Mei agreed on prices and supply levels for TFT-LCD Products.

118. Defendant Chunghwa participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Chunghwa agreed on prices and supply levels for TFT-LCD Products.

119. Defendant HannStar participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, HannStar agreed on prices and supply levels for TFT-LCD Products.

120. Defendant Hitachi had multiple bilateral discussions during the Relevant Period, and agreed on prices and supply levels for TFT-LCD Products.

121. Defendant LG Display participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, LG Display agreed on prices and supply levels for TFT-LCD Products.

122. Defendant Samsung participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Samsung agreed on prices and supply levels for TFT-LCD Products.

123. Defendant Sharp participated in multiple group and bilateral meetings during the Relevant Period, and agreed on prices and supply levels for TFT-LCD Products.

124. Defendant Toshiba participated in bilateral discussions during the Relevant Period, and agreed on prices and supply levels for TFT-LCD Products.

125. Defendant Sanyo Consumer participated in at least one bilateral meeting through an agent during the Relevant Period, and agreed on prices and supply levels for TFT-LCD Products.

126. Defendant Taiwan Mitsui participated in multiple bilateral meetings during the Relevant Period, and agreed on prices and supply levels for TFT-LCD Products. In addition, Taiwan Mitsui attended at least one bilateral meeting with defendant Chunghwa during 2001 at which similar subjects were discussed. At that and other meetings, Taiwan Mitsui acted as an agent of Sanyo Consumer and reached agreements with other competitors about prices for TFT-LCD Products sold in the United States and elsewhere.

32

127.     Co-conspirator Hydis participated in multiple lower level meetings between at least 2002 and 2005. In addition, Hydis had a bilateral meeting with a Taiwanese defendant at least as recently as 2005. Through these discussions, Hydis agreed on prices and supply levels for TFT-LCD Products.

128.     Co-conspirator Mitsubishi participated in multiple lower level meetings in 2001 with Chi Mei, Chunghwa, Samsung, and Unipac Electronics (later AU Optronics). Through these meetings, Mitsubishi agreed on prices and supply levels for TFT-LCD Products.

129.     Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese defendant in 2001. Mitsui was acting as an agent for defendant Epson Japan in this discussion. Mitsui and Epson Japan agreed on prices and supply levels for TFT-LCD Products.

130.     Co-conspirator NEC participated in meetings or discussions during the Relevant Period with at least one other defendant or co-conspirator, which included discussions about prices for TFT-LCD Products.

131.     Co-conspirator Sanyo Electric Company, Ltd. participated in meetings or discussions during the Relevant Period with at least one other defendant or co-conspirator, which included discussions about prices for TFT-LCD Products.

132.     Co-conspirator Sanyo North America Corporation participated in meetings or discussions during the Relevant Period with at least one other defendant or co-conspirator, which included discussions about prices for TFT-LCD Products.

133.     Co-conspirator Seiko Epson Corporation participated in meetings or discussions during the Relevant Period with at least one other defendant or co-conspirator, which included discussions about prices for TFT-LCD Products.

134.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual

participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them. Furthermore, to the extent that subsidiaries within the corporate families distributed TFT-LCD Products to direct purchasers, these subsidiaries played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings. Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

135.    Defendant Epson America is a wholly-owned and controlled subsidiary of defendant Epson Japan and, as alleged above, Epson Japan was represented by co-conspirator Mitsui at one of the bilateral meetings described above. Mitsui served as an agent of, and under the direction of, Epson Japan and Epson America. Epson Japan and Epson America, through their agent, were parties to the agreements made at those meetings and acted as co-conspirators. In addition, to the extent Epson America distributed TFT-LCD Products to direct purchasers, it played a significant role in the conspiracy because defendants wished to ensure that the prices for such products paid by direct purchasers did not undercut the pricing agreements reached at these various meetings. Epson America was an active, knowing participant in the alleged conspiracy.

136.    Defendant Toshiba Matsushita is a joint venture between Toshiba Corporation and Panasonic, and one or more of the partners in this joint venture participated in the meetings described above. As a result, Toshiba Matsushita was represented at those meetings by its agents and was a party to the agreements entered into by its joint venture partners at them. As explained above, the agreements at these meetings included agreements on price ranges and output restrictions. The joint venture partners controlled Toshiba Matsushita's production levels and the prices of TFT-LCD Products the joint ventures sold both to the joint venture partners and

34

other non-affiliated companies. Thus, this defendant was an active, knowing participant in the alleged conspiracy.

137.    Co-conspirator IPS Alpha is a joint venture among Hitachi Displays, Ltd., Toshiba Corporation, and Panasonic, and one or more of the partners in this joint venture participated in the meetings described above. As a result, IPS Alpha was represented at those meetings and was a party to the agreements entered into by its joint venture partners at them. As explained above, the agreements at these meetings included agreements on price ranges and output restrictions. The joint venture partners had substantial control over IPS Alpha's production levels and the prices of TFT-LCD Products the joint ventures sold both to the joint venture partners and other non-affiliated companies. Thus, IPS Alpha and Panasonic were active, knowing participants in the alleged conspiracy.

**E.    International Government Antitrust Investigations**

138.    Defendants' conspiracy to restrict artificially the output of, and to raise the prices for, TFT-LCD Products sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the United States Department of Justice ("DOJ") and others in late 2006.

139.    In December of 2006, government authorities in Japan, Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity among TFT-LCD manufacturers. In a December 11, 2006 filing with the Securities and Exchange Commission, defendant LG Display disclosed that officials from the Korea Fair Trade Commission and Japanese Fair Trade Commission ("JFTC") had visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose office.

140.    On December 12, 2006, news reports indicated that in addition to LG Display, TFT-LCD makers Samsung, Sharp, Epson, and AU Optronics were also under investigation. The JFTC stated that the probe was related to price-fixing. On that same date, the European Commission confirmed publicly that it as well was investigating the possibility of a

cartel agreement and price-fixing among manufacturers of TFT-LCD Products.

141.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers – LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd. – to plead guilty and pay a total of $585 million in criminal fines for their roles in the conspiracy to fix prices of TFT-LCD panels.

142.    LG Display Co., Ltd and LG Display America Inc. agreed to plead guilty and pay a $400 million fine for their participation in a conspiracy from September 2001 to June 2006 to fix the price of TFT-LCD panels sold in the United States.

143.    Chunghwa Picture Tubes, Ltd. agreed to plead guilty and pay a $65 million fine for its participation in a conspiracy from September 2001 to December 2006 to fix the price of TFT-LCD panels sold in the United States.

144.    The DOJ charged LG Display Co., Ltd., LG Display America Inc., and Chunghwa Picture Tubes, Ltd. with carrying out the conspiracy by:

        a.  participating in meetings, conversations, and communications in Taiwan, Korea and the United States to discuss the prices of TFT-LCD panels;

        b.  agreeing during those meetings, conversations and communications to charge prices for TFT-LCD panels at certain pre-determined levels;

        c.  issuing price quotations in accordance with the agreements reached; and

        d.  exchanging information on sales of TFT-LCD panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

145.    Sharp Corporation agreed to pay a $120 million fine for its participation in

conspiracies to fix the price of TFT-LCD panels sold to Dell, Inc. from April 2001 to December 2006 for use in computer monitors and laptops; to Motorola, Inc. from autumn 2005 to the middle of 2006 for use in Razr mobile phones; and to Apple Computer, Inc. from September 2005 to December 2006 for use in iPod portable music players.

      146.    Sharp Corporation agreed to plead guilty to fixing the price of TFT-LCD panels sold to Dell between 2001 and 2006 by:

     a.   participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD panels to be sold to Dell;

     b.   agreeing during those bilateral meetings, conversations and communications to charge prices of TFT-LCD panels at certain pre-determined levels to Dell;

     c.   issuing price quotations in accordance with the agreements reached; and

     d.   exchanging information on sales of TFT-LCD panels to be sold to Dell for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

      147.    Sharp Corporation agreed to plead guilty to fixing the price of TFT-LCD panels sold to Motorola and Apple between 2005 and 2006 by:

     a.   participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD panels to be sold to Apple and Motorola;

     b.   agreeing during those bilateral meetings, conversations and communications to charge prices of TFT-LCD panels at certain pre-

determined levels to Apple and Motorola;

c.  issuing price quotations in accordance with the agreements reached;
    and

d.  exchanging information on sales of TFT-LCD panels to be sold to
    Apple and Motorola, for the purpose of monitoring and enforcing
    adherence to the agreed-upon prices.

148.    In May 2009, the DOJ announced that it had reached an agreement with
Hitachi to plead guilty and pay $31 million in criminal fines for its role in the conspiracy to fix
prices of TFT-LCD panels.

149.    Hitachi admitted that from April 1, 2001 to March 31, 2004 it participated
in a conspiracy with other major TFT-LCD producers, the primary purpose of which was to fix
the price of TFT-LCD sold to Dell for use in notebook computers. Hitachi admitted that in
furtherance of the conspiracy it, through its officers and employees, engaged in telephone
discussions and attended bilateral meetings with other major TFT-LCD producers.

150.    In August 2009, the DOJ reached an agreement with Epson to plead guilty
and pay a $26 million fine for its role in the conspiracy to fix prices of TFT-LCD panels.

151.    Epson admitted that from the fall of 2005 to the middle of 2006, it
participated in a conspiracy with other major TFT-LCD producers, the primary purpose of which
was to fix the price of TFT-LCD panels sold to Motorola, Inc. for use in mobile phones. Epson
admitted that in furtherance of the conspiracy it, through its officers and employees, engaged in
bilateral telephone discussions and attended bilateral meetings in Japan with representatives of
other major TFT-LCD producers. During these discussions and meetings, agreements were
reached to fix the price of TFT-LCD panels sold to Motorola.

152.    Several senior executives for Chunghwa and LG Display have also
reached plea agreements with the DOJ to plead guilty for their roles in the conspiracy to fix the
price of TFT-LCD panels.

153. These guilty pleas demonstrate that the investigations into the TFT-LCD industry are not mere information gathering efforts by regulatory authorities. In fact, as the DOJ's representative has stated, the DOJ's investigation into the TFT-LCD industry is premised in part on insider information that presents a detailed "road map" of the conspiracy.

154. The guilty plea by Sharp has significant ramifications for Toshiba. Toshiba was one of Sharp's principal competitors in the sale of TFT-LCD panels to Dell and Apple during the periods set forth in the DOJ's information against Sharp. Toshiba sold TFT-LCD panels to Dell between 2000 and 2006, and it sold TFT-LCD panels for use in Apple's iPod music players between 2001 and 2006. In fact, Toshiba was one of Apple's largest, if not largest, supplier of iPod screens for a substantial part of the Relevant Period. In the small-to-medium size TFT-LCD display market, Toshiba Matsushita was ranked second (behind Sharp) in worldwide market share in the first half of 2005, holding a 15.4 percent market share during the first quarter and a 14.1 percent market share during the second quarter. Toshiba's high percentage of TFT-LCD revenues dictated that no conspiracy would be effective without its participation. Sharp could not have successfully fixed the prices of the TFT-LCD panels it sold to Dell and Apple unless Toshiba, one of its biggest competitors, agreed not to undersell it.

**F.** **Market During the Conspiracy**

155. After initial introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends. However, since at least 1996, the TFT-LCD Products market has been characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices. Defendants achieved price stability and price increases by agreeing to fix and maintain prices and to restrict supply through decreases in capacity utilization and restraint in new plant investment.

156. As described herein, defendants' TFT-LCD cartel evolved over time. Defendants initiated their cartel when TFT-LCD Products were in their relative infancy. At that time, defendants balanced the desire to set prices collusively with the industry goal of establishing their products in the marketplace. As the cartel matured, new entrants were co-

opted, and production costs declined.  At the same time, conspirators learned how they could best mitigate the crystal cycle by agreeing on prices and output.

      **1.**   **1996**

      157.   By early 1996, analysts were lamenting the excess supply and drastic price cuts in the TFT-LCD markets.  The downward pressure on prices, which had already fallen 40 to 50 percent in 1995, was projected to continue due to lower manufacturing costs.  Despite this, TFT-LCD Product prices actually rose in 1996, allegedly due to insufficient production capacity.  In reality, defendants were fixing the prices.

      158.   During this period, the Japanese companies herein began to partner with Taiwanese companies to trade technology and collaborate on supply.  Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped to Japan.  This mutually beneficial relationship between purported competitors continued into at least 1999.

      159.   A few months into 1996, there was a reversal in the downward trend in TFT-LCD Product prices and an alleged inability of manufacturers to supply enough TFT-LCD panels to meet demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon .... Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

      160.   By mid-1996, industry analysts were commenting on an unusual rise in TFT-LCD panel prices that was noted to be "quite rare in the electronics industry."

      161.   The "rare" increase in TFT-LCD panel prices was due to the agreements reached by the Japanese companies to increase prices.  These companies met and agreed to increase prices and control supply in order to stop any price erosion as herein alleged.

      162.   1996 also brought the advent of third generation fabs.  In order to stay current with technology, manufacturers were moving quickly into third generation motherglass.  LG Electronics, Inc. was scheduled to have its third generation fab online by 1997, and Hyundai

was scheduled to do so by early 1998. However, manufacturers falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier. This resulted in surging prices. These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

### 2.    1997 – 1998

163.    By 1997, Japanese manufacturers were steadily sending engineers to Taiwan to provide the Taiwanese manufacturers with the most up-to-date technology. In return, the Japanese received output from Taiwanese plants. In 1998, Chi Mei entered into such a strategic alliance with Fujitsu, a Japanese manufacturer that Sharp acquired in 2005. These arrangements between Japanese and Taiwanese companies resulted in cooperative discussions between supposed competitors. It was also expected to contribute to an increase in supply of TFT-LCD panels.

164.    By 1998, the TFT-LCD industry still had excess capacity, due in part to the still recent entry of the Korean companies. A March 30, 1998 article in *Electronic News* reported that Hyundai's production lines were running at only 20 to 50 percent of capacity. The article quoted Rob Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty of inventory and capacity available to suit any shortage .... You have to get your production up to full capacity again before you can even talk about there being a shortage and I think there are plenty of under-capacity fabs right now to bear the burden."

165.    During this period, Samsung made a concerted effort to get other manufacturers in the industry to limit production. Yoon-Woo Lee, President and CEO of the Semiconductor Division of Samsung Electronics Co., Ltd. gave the keynote address at the Eighteenth International Display Research Conference (known as Asia Display 98). Mr. Lee said:

> In order to maintain the tradition of top CRT manufacturer, we need to capture the high end market [and] deviate from the volume production

of CRTs and LCDs.

Taiwan is trying to enter TFT-LCD business because it has the advantage of the large PC production. To survive in the rapidly changing environment, we have to revise our previous strategies and redirect our business plans. It is time for fundamental shift for future decisions, time for transformation from volume driven to cost driven, time for driving value added strategies.

*If we prepare now by shifting from the traditional business approach, to value added new approach, we may be able to deviate from repeating the "crystal cycle" again.*

[Emphasis added.]

166.    Samsung's effort to limit production, capacity restraints and the price-fixing agreement caused decreases in prices of TFT-LCD Products to slow and stop in late 1998.

### 3.    **1999**

167.    The efforts commenced by Samsung in 1998 continued to bear fruit. In 1999, TFT-LCD Product prices surged during that year due to a claimed "massive undersupply." This was despite the entry of Taiwanese manufacturers and several new fabs coming online.

168.    At the beginning of 1999, industry publications suggested that the Japanese and Korean manufactures were going to have the opportunity to recoup previous years' losses: "The AM-LCD imbalance has triggered cash-strapped Japanese and Korean vendors to up their tags in an effort to wash away the stain left by years of red ink ...."

169.    By mid-1999, a Korean source was reporting: "[w]ith the supply shortage for TFT-LCD panels unlikely to be corrected in the near future, the domestic LCD industry is gleefully increasing its sales targets amid a sharp price rise." The lack of supply was a pretextual reason given publicly to justify a price increase.

170.    Significantly, Boch Kwon, Vice President of LG Display's Sales Division and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, announced the following in the same trade publication:

LG LCD will raise prices across its entire TFT-LCD portfolio by 30 to 40 percent this year, Kwon said, although he expects that prices will stabilize some time in the second half. According to Samsung, demand for larger panels is reducing capacity because each display is eating up more square inches per motherglass substrate. This, combined with a stagnation in capital spending by many panel makers, will keep the LCD industry in a period of relative shortage until 2001, Lee said. The shortage has become acute, and has created an unusual market in which prices could rise as much as 30% to 80% in one year according to Ross Young, President of DisplaySearch, a research firm in Austin, Texas.

171. Also, in 1999, the three major TFT-LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai. The year 1999 also saw an additional merger when LG Electronics, Inc. and Koninklijke Philips Electronics N.V. created defendant LG Display.

### 4.   2000 – 2001

172. By January of 2000, prices for TFT-LCD Products were falling again. The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors, including Chi Mei, Chunghwa, HannStar, and Acer Display Technology, Inc. (later part of AU Optronics). Taiwanese defendants began their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other defendants to gain immediate market share. However, by 2000-2001, the Taiwanese defendants had increased their market share to the point that it made sense to participate in the conspiracy, and they then moderated the volume of their production.

173. Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity. Two of the largest Korean firms announced plants to invest billions in Taiwanese TFT-LCD panel production and to locate manufacturing facilities in Taiwan.

174. Newer generation fabs reduced costs and provided opportunities for additional profits at cartelized prices. In fact, a leading industry research house indicated that LCD manufacturers would pour $5 billion into new manufacturing in 2000, roughly equivalent to

the amount the industry spent in the previous three years combined.

175.    In October 2000, *The Korean Herald* reported that, "IDC estimates that the global LCD supply is one to two percent in excess and the unbalance will rise to seven percent next year as manufacturers continue to book their output."

176.    Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of TFT-LCD panels stopped declining in mid-2001, and actually increased. In late 2001, a senior official at LG Display stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability." Similarly, industry insiders suggested that the price increases were the result of an inability to meet increased demand. However, published data for 2001 showed that several defendants were operating their fabs significantly below capacity. For example, Chunghwa had a 75.3 percent utilization rate and Quanta Display, Inc. (which later merged with AU Optronics) had a 52 percent utilization rate. Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, the Taiwanese firms had begun actively cooperating with Japanese and Korean incumbents to restrict supply. Again, defendants reacted to the price trough by conspiring to fix prices. This agreement was reached in part at the bilateral and group meetings described above.

177.    The rise in prices made no economic sense at this point in time and was the product of defendants' setting the price of TFT-LCD Products by agreement. First, defendants were bringing new plants on line that utilized larger motherglass, which was more cost effective. Second, as reported by an industry source, the variable cost of producing TFT-LCDs was declining during the latter part of 2001 and into 2002. With lower production costs and capacity to spare, it made little economic sense for defendants not to utilize their full capacity other than agreement by them not to do so.

### 5.    2002 – 2003

178.    Prices continued to rise from the second half of 2001 through the second

half of 2002. Industry analysts attributed these price increases to a "larger-than-expected panel shortage," despite continuing capacity expansion. In reality, the price increases were the result of agreements reached in the crystal meetings and bilateral discussions described above.

179.    By the second half of 2002, the cartel's success at propping up prices led to lagging demand, and the cartel's response was to let prices level off and even begin to fall. Such downward price trends are not inconsistent with a monopoly or cartel.

180.    Throughout 2002, industry leaders shifted to fifth generation motherglass production technology. According to officials at Samsung, "[t]he new fifth-generation facilities offer panels that are 11.5 times bigger in size than those of the first-generation production line, while production cost is 20 percent lower than the fourth-generation counterpart because of the decrease in number of necessary part."

181.    Industry analysts took note of the unusual trends in the pricing of TFT-LCD Products. In February 2004, CNET.com quoted an analyst from IDC, a market research firm, as saying that, "LCD is one of the few [markets] where things have actually gone up in price." As described above and as further detailed below, defendants explained these price increases with false statements about market conditions in order to cover up the conspiracy.

182.    During the five consecutive quarters in 2003 and 2004, TFT-LCD Product prices rose significantly. AU Optronics reported that the price for certain of its TFT-LCD Products increased 28 percent between the second quarter of 2003 and the second quarter of 2004. Similarly, LG Display reported that its pricing increased by 21 percent over the same period.

183.    These soaring prices resulted in similar increases in the profits reaped by the TFT-LCD Product manufacturers. For example, the eight largest TFT-LCD Product

manufacturers reported a collective profit increase of 740 percent between the second quarter of 2003 and the second quarter of 2004. These record profits resulted from defendants' collective action to fix, raise, maintain or stabilize the price of TFT-LCD Products. Again, the sharing of information about price and production, the under-utilization of capacity, and restraints on output drove up the prices of TFT-LCDs.

184.    Around this time, industry analysts suggested that there were too many competitors in the TFT-LCD Product marketplace. Some industry participants went as far as overtly suggesting that the industry should seek to curtail supply though mergers. These suggestions were carried out. Significant consolidation and collaboration among competitors in the TFT-LCD Product market occurred.

185.    While TFT-LCD Product prices were increasing in late 2003, AU Optronics, Chi Mei, and HannStar decreased capacity utilization, as had been agreed to in crystal meetings.

186.    As noted above, Toshiba Corporation and Panasonic merged their TFT-LCD operations. The joint venture announced plans to solicit investment from other companies involved in the production of TFT-LCD panels, including device manufacturers and material suppliers. NEC formed an alliance with Casio. In addition, Taiwanese TFT-LCD manufacturers agreed to supply Panasonic with TFT-LCD panels for use in televisions.

187.    Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's IDT, a former subsidiary of IBM, and AU Optronics purchased a 20 percent stake in Japan's Fujitsu Display Technology.

188.    Despite the increased efficiency and costs savings of fifth generation fabs, the industry experienced higher prices in 2003, purportedly because of a shortage of the most

popular sizes of TFT-LCD panels. In order to keep prices artificially high, defendants chose not to operate at full capacity, nor to take advantage of lower variable costs.

6.   **2004**

189.   Pursuant to defendants' agreement to fix and stabilize prices, prices continued to rise during the first half of 2004. In fact, between 2003 and mid-2004, panel prices increased for five consecutive quarters. Various types of crystal meetings were ongoing during this period.

190.   The cartel's success at raising prices slowly dampened demand. In response, the cartel allowed prices to once again level off and began to decline in the second half of 2004. During this period of time, the market for TFT-LCD televisions started to grow, with the 32-inch panel representing approximately 9 percent of the market.

191.   In late 2004, AU Optronics reduced financial forecasts, claiming that overcapacity-driven price declines were eroding profits. AU Optronics publicly announced plans to reduce capacity at its sixth generation fabs by 30 percent and to delay a planned seventh generation facility.

192.   Consolidation and collaboration among and between competitors continued as Samsung and Sony launched their joint venture, named S-LCD Corp.

7.   **2005**

193.   Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005. However, by the third quarter of 2005, it was clear that the industry was not facing oversupply, but rather was reaping the benefits of a panel shortage and stable, or increasing, panel prices.

194.   By 2005, 15-inch notebooks had surpassed 14-inch notebooks as the

predominant product, and the volume of 32-inch panels for televisions took off as well. In 2005, 32-inch panels represented almost 27 percent of sales.

195.    Around this time, Samsung announced its intention to increase production of 40-inch TFT-LCD panels from 20,000 units in the second quarter to 150,000 units in the fourth quarter. An immediate increase to 100,000 units occurred the very next month. Samsung's ability to immediately increase output so drastically shows how quickly manufacturers could ramp up capacity and increase utilization.

196.    Analysts forecast excess production capacity in 2005 because of large TFT-LCD plants from Samsung and LG Display being brought on line. However, Sharp executive director Toshishige Hamano reported in October 2005 that the supply of LCD panels, particularly for use in televisions larger than 32 inches, would fall short of demand by 15 to 30 percent. The shortage came as a surprise to analysts.

197.    This shortage was the result of collusion among defendants. Dr. Hui Hsiung, Executive Vice President and Director of AU Optronics, admitted in November of 2005 that his company persuaded its competitors to lower the inventory for TFT-LCD Products:

> I think our policy, our strategy, has always been minimizing our inventory and that turned out to be quite successful in past few years by keeping the inventory lower. And I think in the past we did have some problem convincing our competitors doing the same thing. *But in recent months, especially this year, actually, it did start to happen. I think that the industry understand[s] the benefit of keeping the capacity low.* Again, even if the scenario does happen that we have a 5% over capacity this is not the drastic action to reduce about 5% of the loading. And this, coupled with the fact that many of the product cost structure is some 80% are actually material costs. So, fixed costs at 20% if you reduced the 5%, even 10%, loading, that impact on cost is actually, not very big. So, we think the industry become more mature. That is precisely what our competitors would do.

[Emphasis added.]

198.    Indeed, earlier that year, spokespersons for LG Display and Samsung had predicted that market stabilization.

199.    A Samsung presentation from November of 2005 made by Sang-Wan Lee, the President of Samsung's TFT-LCD Products business, noted that it was possible to "secure a reasonable amount of profit while following the industry leaders."

200.    These collusive actions were being perpetuated through the series of ongoing meetings as alleged above.

201.    The effect of the conspiracy can be seen both in the way prices followed each other and the way prices for particular products converged as the conspiracy progressed.

    8.    **2006**

202.    A temporary oversupply of TFT-LCD Products occurred in 2006, which had the effect of reducing prices in the short term. Again, in the face of a price trough, defendants fixed and stabilized prices through their cartel activities. On May 25, 2006, at a Taiwanese trade show, Mr. Hsiung of AU Optronics stated publicly that his company was reducing production of those products in order to avoid further price erosion. He expressed the view that his competitors should follow suit, saying that production ought to be reduced by at least 15 percent. Eddie Chen, a spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in conjunction with his company's peers. A June 13, 2006 article in *InfoWorld* noted that as a result of Mr. Hsiung's statements, "[t]he chatter is growing louder each day."

203.    Chi Mei was not the only one to follow AU Optronics' invitation to restrict the output and increase the prices of TFT-LCD Products. In May of 2006, in discussions

between executives of the two companies, AU Optronics convinced Quanta Display, a company that it acquired in October of 2006, to reduce production of TFT-LCD Products. By June of 2006, LG Display also announced plans to cut production of TFT-LCD Products.

204.    By the summer of 2006, this ongoing conspiracy was being effectuated through bilateral meetings as alleged above.

205.    Despite the fact that certain of the defendants may have cut back on, or discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental investigations described below, the impact of the conspiracy continued at least through the end of that year. This carry-over in the antitrust injury was due, in part, to the nature of the pricing mechanisms in the industry, such as supply contracts.

### G.    The Role of Trade Associations During the Relevant Period

206.    The TFT-LCD industry is served by several major trade organizations that put on industry-wide meetings several times a year. These meetings have facilitated collusion, and the trade associations have themselves functioned as a means for defendants to cooperate and discuss prices.

207.    One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AU Optronics, Chi Mei, and HannStar belong. Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry." TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT TFT-LCD affiliations to visit TTLA." Thus, TTLA was not merely a trade association that

50

provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

208.    South Korean manufacturers, including LG Display and Samsung, had similar trade associations during the Relevant Period, known as EDIRAK (the Electronic Display Industrial Research Association of Korea) and KODEMIA (the Korea Display Equipment Material Industry Association). EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK has had a cooperation pact with the United States Display Consortium ("USDC"). Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

209.    Japanese manufacturers of TFT-LCD Products have a similar organization of their own. The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of TFT-LCD Products. Its members include Sharp, Toshiba, NEC, Hitachi, and a Japanese subsidiary of Samsung. Like the KODEMIA and TTLA, the SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

210.    In addition to these national trade associations, the Society for Information Display ("SID") put on multiple meetings each year that were attended by executives from all of the major producers. One of these meetings had been known as the SID Symposium, but was renamed the "SID International Symposium and Business Conference." SID also puts on a long-running conference called the International Display Research Conference ("IRDC").

211.    The 2004 SID International Symposium and Business Conference ("SID 2004") featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President

51

and CEO of AU Optronics. This was followed shortly by a presentation entitled "The FPD

Capital Equipment Investment Environment," which informed the attendees about "investments

planned at the major display manufacturers." A representative of DisplaySearch also spoke about

the TFT-LCD market. There were presentations by analysts from iSuppli/Stanford Resources,

and other industry experts. This was all followed by a "networking reception – sponsored by

LG.Philips TFT-LCD," to which all conference attendees were invited to participate.

212.    SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU

Optronics. This time it was called "2005: Beyond the Crystal Gateway." A DisplaySearch

representative provided "the latest outlook for flat panel displays covering pricing, demand, and

supply . . . and the cost and margin outlook for key FPDs will be projected." Again, these

discussions about the market were followed by a "networking reception." Among the attendees

at SID 2004 were Bruce Berkoff of LG Display, Jun Souk and Dong-Hun Lee of Samsung, H.B.

Chen of AU Optronics, Larry Weber of Panasonic, and Joel Pollack of Sharp. Senior executives

from Sharp and Hitachi also attended.

213.    The SID 2005 conference was very similar to SID 2004 but was even

more blatant in its discussion of the crystal cycle. Jun H. Souk, Executive Vice President of

Samsung, gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as

follows: "By reviewing what happened during the business up and down cycles of the TFT-LCD

in the past, we have learned lessons that will reduce the burden in future cycles. Efforts made in

cost reduction line-investment timing, and new market generation will be described."

214.    SID 2005 provided a prime opportunity for one of the dominant

manufacturers to explain to all of its key competitors how to manage supply and maximize "line-

investment timing." Among the attendees at SID 2005 were Bruce Berkoff of LG Display and

Sang Wan Lee, Jun Souk, and Joe Virginia of Samsung. SID 2005 also featured presentations regarding developments in TFT-LCD technology by officials from AU Optronics, Sharp, LG Display, Samsung, and Hitachi.

215.    The conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005. The initial conference was held in March of 2005 in Tokyo and the 2006 conference was held from February 28 to March 3, 2006 in Okinawa, Japan.

216.    Participants in the 2006 GFPC noted how successful the event was in promoting information exchanges and "networking" among the co-conspirators. Or, as Dr. Hui Hsiung has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to build connections across the supply chain and around the world . . . the GFPC plays a vital part in building those connections and growing our business."

217.    Among the participants at GFPC 2006 were Mr. Souk and Ho Kyoon Chung of Samsung, Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Ogura of Toshiba Matsushita, Yoshihide Fuji of Toshiba, Mr. Nakajima of Panasonic, and Dr. Hui Hsiung of AU Optronics.

218.    As indicated by the public pronouncements, these trade association meetings facilitated the conspiracy by giving defendants further opportunities to discuss prices and output.

## VIII.    PLAINTIFFS' INJURIES

219.    As a distributor of computer monitors, large format TVs and displays, notebook computers, and projectors that contained TFT-LCD panels, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as purchasers of TFT-LCD Products as a

result of defendants' conspiracy to raise, fix stabilize, or maintain the price of TFT-LCD

Products at supra-competitive levels. Defendants' conspiracy artificially inflated the price of

TFT-LCD Products causing plaintiffs to pay higher prices than they would have in the absence

of defendants' conspiracy.

220.    Plaintiffs also purchased TFT-LCD Products containing TFT-LCD panels

from OEMs as well as others, which in turn purchased TFT-LCD panels from defendants and

their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of TFT-

LCD panels purchased by these OEMs and others, which paid higher prices for TFT-LCD panels

than they would have absent the conspiracy. The conspiracy artificially inflated the prices of

TFT-LCD panels included in TFT-LCD Products.

221.    The OEMs and others passed on to their customers, including Plaintiffs,

the overcharges caused by defendants' conspiracy. Plaintiffs were not able to pass on to their

customers the overcharges caused by defendants' conspiracy. Thus, Plaintiffs suffered injury

when it purchased TFT-LCD Products containing such price-fixed TFT-LCD panels from the

OEMs and others.

222.    Once a TFT-LCD Panel leaves its place of manufacture, it remains

essentially unchanged as it moves through the distribution system. TFT-LCD panels are

identifiable, discreet physical objects that do not change form or become an indistinguishable

part of a TFT-LCD Product. Thus, TFT-LCD panels follow a physical chain from defendants

through manufacturers of TFT-LCD Products sold to Plaintiffs.

223.    The market for TFT-LCD panels and the market for TFT-LCD Products

are inextricably linked and cannot be considered separately. Defendants are well aware of this

intimate relationship.

224. The TFT-LCD Product OEMs' demand for TFT-LCD panels was relatively inelastic, because there were no reasonable substitutes for TFT-LCD panels to serve as visual display for products such as desktop computer monitors and notebook computers. Other competing display technologies, such as OLED (Organic Light Emitting Diodes) displays, were not available during the Relevant Period and are only today becoming widely available. In addition, throughout the Relevant Period, defendants controlled the market for TFT-LCD panels. Consequently, during the Relevant Period, the OEMs had no choice but to purchase TFT-LCD panels from defendants and others at prices that were artificially inflated, fixed and stabilized by defendants' conspiracy.

225. As a result, Plaintiffs were injured in connection with their purchases of TFT-LCD Products during the Relevant Period.

## IX.    FRAUDULENT CONCEALMENT

226. Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until December 2006, when investigations by the DOJ and other antitrust regulators became public. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of TFT-LCD Products.

227. The participants in the crystal meetings agreed to keep the meetings secret. In some instances, the location of the meeting was circulated only the day before in an effort to avoid detection. Furthermore, the participants agreed on what pretexts they would cite when questioned about rising prices. The participants also agreed to lie to the media and report that

their fabs were operating at full capacity even when they were not, in order to create the appearance of a supply shortage.

228. Defendants have used a variety of other purportedly market-based explanations for price increases in order to conceal their conspiracy. In 1999, Joel Pollack, a marketing manager for Sharp, blamed the sharp price rises of early 1999 on under-capitalization:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry.

229. Also, in early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far is outstripping our supply capability" and predicted that "prices will continue to increase until a reasonable balance is achieved."

230. Also in 1999, Boch Kwon, Vice President of LG Display's Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, falsely reported that price increases resulted from "acute" shortages.

231. On February 4, 2001, Bruce Berkoff, Executive Vice President at LG Display, was quoted by News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up."

232. In the latter half of 2001, Koo Duk-Mo, an executive at LG Display, predicted a 10 to 15 percent price increase, purportedly resulting from increased demand during the holiday season.

233. Hsu Jen-Ting, a Vice President at Chi Mei, and Chen Shuen-Bin, President of AU Optronics, offered another rationale for the 2001 price increase in an interview for the *Taiwan Economic News* in October 2001. They blamed "component shortages due to the

late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with TFT-LCD monitors."

234.    In a PowerPoint shown to investors on September 16, 2003, Toshiba gave the following pretextual explanation for its soaring revenues: "*LCDs*: Profitability recovered faster than originally expected." A question-and-answer sheet released to investors that same day offered a better clue to its participation in the ongoing conspiracy: "Q4. How are recent prices for TFT-LCDs . . .? [Answer:] They remain high."

235.    These explanations were pretextual and served to cover up the conspiracy. Later price increases were explained by industry leaders as derived from new demand for TFT-LCD televisions. In 2005, Koo Duk-Mo of LG Display stated "[w]e are seeing much stronger demand for large-size TFT-LCD TVs than expected, so TFT-LCD TV supply is likely to remain tight throughout the year."

236.    As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims of plaintiffs arising from the anticompetitive conduct alleged in this Complaint.

**237.**    The statute of limitations has also been tolled as a result of the filing of a class action against defendants and co-conspirators.

## X.    **CLAIM FOR VIOLATIONS**

### **First Claim for Relief**
### **(Violation of Section 1 of the Sherman Act)**

238.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

239.    Beginning no later than January 1, 1996, the exact date being unknown to plaintiffs and exclusively within the knowledge of defendants, defendants and their co-

conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

240. In particular, defendants combined and conspired to raise, fix, maintain or stabilize the prices of TFT-LCD Products sold in the United States.

241. As a result of defendants' unlawful conduct, prices for TFT-LCD Products were raised, fixed, maintained and stabilized in the United States.

242. The contract, combination or conspiracy among defendants consisted of a continuing agreement, understanding, and concerted action among defendants and their co-conspirators.

243. For purposes of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a. participating in meetings and conversations to discuss the prices and supply of TFT-LCD Products;

    b. communicating in writing and orally to fix target prices, floor prices, and price ranges for TFT-LCD Products;

    c. agreeing to manipulate prices and supply of TFT-LCD Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d. issuing price announcements and price quotations in accordance with the agreements reached;

e. selling TFT-LCD Products to customers in the United States at noncompetitive prices;

f. exchanging competitively sensitive information in order to facilitate their conspiracy;

g. agreeing to maintain or lower production capacity; and

h. providing false statements to the public to explain increased prices for TFT-LCD Products.

244. As a result of defendants' unlawful conduct, plaintiffs were injured in their businesses and property in that they paid more for TFT-LCD Products than they otherwise would have paid in the absence of defendants' unlawful conduct.

### Second Claim for Relief
### (Violation of the California Cartwright Act)

245. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

246. During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., which was organized under the laws of the State of California, conducted a substantial volume of business in California. In particular, Plaintiffs purchased TFT-LCD Products from defendants and their co-conspirators in California; maintained warehouses in California containing TFT-LCD Products manufactured and sold by defendants and co-conspirators; and maintained agents and representatives in California who sold TFT-LCD Products to customers in California and elsewhere. As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

247. In addition, defendants LG Display, Chunghwa, Sharp, Hitachi and Epson all admitted in their plea agreements that acts in furtherance of their conspiracy to fix the price of TFT-LCD panels were carried out in California. Defendants AU Optronics, Chi Mei, Epson, LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period. Employees at defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out defendants' anticompetitive agreement to fix the price of TFT-LCD Products. Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

248. Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1996, and continuing thereafter at least up to and including at least December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720. Defendants have each acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for TFT-LCD Products at supra-competitive levels. Defendants' conduct substantially affected California commerce.

249. The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, TFT-LCD Products.

250. For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do,

including but in no way limited to the acts, practices and course of conduct set forth above and the following:

     a. to fix, raise, maintain and stabilize the price of TFT-LCD Products;

     b. to allocated markets for TFT-LCD Products amongst themselves;

     c. to submit rigged bids for the award and performance of certain TFT-LCD Products contracts; and

     d. to allocate among themselves the production of TFT-LCD Products.

251. The combination and conspiracy alleged herein has had, inter alia, the following effects:

     a. price competition in the sale of TFT-LCD Products has been restrained, suppressed and/or eliminated in the State of California;

     b. prices for TFT-LCD Products sold by defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

     c. those who purchased TFT-LCD Products from defendants, their co-conspirators, and others and TFT-LCD Products containing price-fixed TFT-LCD panels from defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

252. As a result of the alleged conduct of defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the TFT-LCD Products they purchased during the Relevant Period.

253.    As a direct and proximate result of defendants' conduct, Plaintiffs have been injured in their business and property by paying more for TFT-LCD Products containing price-fixed TFT-LCD panels sold by the defendants, their co-conspirators, and others than they would have paid in the absence of defendants' combination and conspiracy.  As a result of defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief
### (Violation of California Unfair Competition Law)

254.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint;

255.    During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., conducted a substantial volume of business in California.  In particular, Plaintiffs purchased TFT-LCD Products from defendants and their co-conspirators in California; maintained warehouses in California containing TFT-LCD Products manufactured and sold by defendants and co-conspirators; and maintained agents and representatives in California who sold TFT-LCD Products to consumers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California;

256.    Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq*;

257.    Defendants committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of TFT-LCD Products as described above;

258.     The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; (2) violation of the Cartwright Act;

259.     Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

260.     Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

261.     Defendants' conduct was carried out, effectuated, and perfected within the state of California.  Defendants LG Display, Chunghwa and Sharp all admitted that acts in furtherance of the conspiracy to fix the price of TFT-LCD Panels were carried out in California;

262.     By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as result of such business acts and practices described above.

### Fourth Claim for Relief
### (Violation of the New York Donnelly Act)

263.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint:

264.     Plaintiffs are corporations organized and existing under the laws of the State of New York and during the Relevant Period, Plaintiffs and their predecessor entities conducted a substantial volume of business in New York.  In particular, Plaintiffs purchased TFT-LCD Products from defendants and their co-conspirators in New York; maintained

warehouses in New York containing TFT-LCD Products manufactured and sold by defendants and co-conspirators; and maintained agents and representatives in New York who sold TFT-LCD Products to consumers in New York and elsewhere. As a result of their presence in New York and the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

265. Beginning at a time presently unknown to Plaintiffs, but at least as early as December 23, 1998, and continuing thereafter at least up to and including at least December 11, 2006, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

266. Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of TFT-LCD Products in New York and fixed, raised, maintained and stabilized TFT-LCD Products prices in New York at artificially high, non-competitive levels.

267. As a result, defendants' conspiracy substantially affected New York commerce

268. As a direct and proximate result of defendants' conduct, Plaintiffs have been injured in their business and property by paying more for TFT-LCD Products purchased from defendants, their co-conspirators and others than they would have paid in the absence of defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq.*

269. As a result of defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

**Fifth Claim for Relief
(Violation of New York Unfair Competition Law)**

270.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

271.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which TFT-LCD Products were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs.

272.     The conduct of the defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y General Business Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

273.     Defendants' unlawful conduct had the following effects: (1) TFT-LCD price competition was restrained, suppressed, and eliminated throughout New York; (2) TFT-LCD Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for TFT-LCD Products.

274.     During the Relevant Period, defendants' illegal conduct substantially affected New York commerce and consumers.

275.     During the Relevant Period, each of the defendants named herein, directly, or indirectly and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold and/or distributed TFT-LCD Products in New York.

Plaintiffs seek treble damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Without prejudice to their contention that defendants' unlawful conduct was willful and knowing, Plaintiffs do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

## XI.  PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the New York Donnelly Act and the unfair competition laws of California and New York and Plaintiffs were injured in their business and property as a result of defendants' violations;

B.    Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of plaintiffs shall be entered against the defendants in an amount to be trebled in accordance with such laws;

C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

F.    Plaintiffs shall receive such other or further relief as may be just and proper.

## XII.   **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: November 6, 2009

Philip J. Iovieno
Ryan T. McAllister
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:  (518) 434-0665
Email: piovieno@bsfllp.com


William Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email:  wisaacson@bsfllp.com

*Counsel for Plaintiffs, Electrograph Systems, Inc. and Electrograph Technologies, Corp.*

67